ROBERTSON, Justice:
Zachary Killebrew sued Security Barge Line, Inc., in the Circuit Court of Holmes County for back injuries allegedly sustained when he jumped from the deck of an empty barge to the coaming (hatch cover) of a loaded barge.
This case was transferred from the Circuit Court of Holmes County to the Circuit Court of Washington County and subsequently tried in that Court'. The jury returned a verdict for $60,000 and on motion for a new trial the court granted the motion on damages alone unless the plaintiff entered a remittitur of $25,000. The plaintiff entered the remittitur, the judgment was reduced to $35,000 and the motion for a new trial was overruled.
Appellant appeals, and appellee cross-appeals assigning as error the reduction of the $60,000 judgment to $35,000.
On January 28, 1971, Killebrew, a young man twenty years of age, of Tchula, Mississippi, was employed by Security Barge Line, Inc., as a deckhand and boarded the towboat ISSAQUENA at Hickman, Kentucky, while it was pushing a tow of loaded and unloaded barges up the Mississippi River. Each barge is about 200 feet long and 35 feet wide. He had previously worked for Security as a deckhand for about two and a half months back in 1969. Appellee explained his job in this way:
“[Yjou’re all the time tightening ratchets, tightening them and carrying them, and tying the barges together, walking back and forth, getting stuff to carry out there, and you’ve always got to have something in your hand like a cheater pipe or a pair of tooth picks, what they call them, to hold the ratchet in place while you tighten it.”
On February 17, 1971, the Issaquena and its tow were northbound on the Mississippi River. The tow consisted of about twelve barges, four deep and three wide, with the eight outside barges being empty and the four middle barges being full of cargo, all being lashed together and pushed by the towboat ISSAQUENA. An empty barge draws about two feet of water and the deck of an empty is about six or seven feet above the deck of a loaded barge alongside.
Killebrew explained what he was doing:
“The captain had told me to string out light cord to where we would have starboard and port light. I took a cord all the way out to just about almost to the middle of the loaded barge. I run out, so I went back to get some more light cord.”
As he was leaving the ISSAQUENA with another light cord, the captain told him to *462 carry a leading line out to the end of an empty barge. Killebrew explained:
“[S]o I had to crawl up on the tow knee to get onto the empty, so I walked down the empty and carried the leading line out on the end of the empty.”
The tow knee is a wide steel device across the front of a towboat used in pushing the barges. The towboat being wider than a barge, all three facing barges are lashed to the tow knee and thestowboat IS-SAQUENA, by means of the tow knee, pushed the entire tow. The tow knee on the towboat side has steps across the entire front of the towboat down to the deck of the towboat. After carrying the leading line to the end of the empty barge, Kille-brew walked about halfway back on the empty barge and when about 100 feet from the tow knee Killebrew decided to jump from the empty barge to the coaming or hatch cover of the loaded barge. The coaming would be about two feet lower and about I14 feet from the deck of the empty barge. Appellee testified that when he landed on the hatch cover of the loaded barge it jarred him and a sharp pain went through his back. He complained to the captain, but did not ask to be put ashore and continued to work until the towboat and its tow reached Greenville, about 10 days later.
About a week or two after he had returned home, he complained to the port captain and, at his suggestion, went to see Dr. Browning in Greenwood. After being in traction for about three weeks, Kille-brew returned to his home and drove a tractor for his uncle for a short time. He went to work on May 15th for Peaster Tractor Company, where he has worked ever since.
Killebrew was examined on July 2, 1971, by Dr. Elmer Nix, an orthopedic surgeon of Jackson. His diagnosis was “probable healing herniated” disc in his lower back. Doctor Nix stated that laymen refer to this condition as a ruptured or slipped disc.
All of appellee’s hospital and medical expenses were paid by appellant, and appellee was paid his full salary up to May 15, 1971, when he went to work for Peaster Tractor Company. He has gotten a raise and is now making $100 a week.
The bases of the appellee’s claim for damages were the unseaworthiness of the towboat and its barges and the negligence of the appellant, in failing to furnish ap-pellee with a safe place to work, failure to properly instruct the appellee in the course of his duties and failure to warn the appel-lee of the dangers incident to his work.
No evidence was adduced as to the unseaworthiness of the towboat ISSA-QUENA or any of the barges in tow. The duty of the shipowner is well stated in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), wherein the Supreme Court said:
“What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service. Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354.” (Emphasis added). 362 U.S. at 550, 80 S.Ct. at 933, 4 L.Ed.2d at 948-949.
Is Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed. 2d 562 (1971), reh. den. 401 U.S. 1015, 91 S.Ct. 1247, 28 L.Ed.2d 552, unseaworthiness is described as a condition which makes the ship not reasonably fit for its intended use. The only “condition”, insofar as the ISSAQUENA and its barges were concerned, was that there were both empty and loaded barges in the same tow, a condition which, by the undisputed testimony, exists 95% to 99% of the time. In *463 other words, it’s a standard and customary thing, absolutely necessary in the river freight business, and a condition of doing business. The ISSAQUENA and its barges were not proved to be unseaworthy in any sense of the term.
Where a shipowner has been held liable to a seaman injured during the process of jumping from one vessel to another, the basis for such liability has been that the seaman was “forced” to jump since no other means of moving from vessel to vessel was available to him or that he was “ordered” to jump by his superiors. Neither of these elements was present in this case. Killebrew was under no compulsion to jump. He could have walked about 100 feet more and descended the steps on the tow knee from the empty barge to the IS-SAQUENA, and then stepped from the ISSAQUENA to the loaded barge by means of the tow knee. Rather than walk the additional 100 feet, he suddenly and on his own decided to jump. He could have sat down and extended his feet over to the coaming, or he could have held on to the edge of the empty and dropped to the deck of the loaded barge. He could have simply stepped across because the coaming was only \t/2 feet away. If there were any danger in jumping, it was perfectly obvious to any person of average or reasonable intelligence. It was not a danger peculiar to ships or barges. A workman putting a roof on a long chickenhouse, rather than use a ladder some distance away, could suddenly decide to jump from the roof to the ground. An employer is under no duty to instruct an employee that in performing his work he should not jump from a greater height to a lower height. A person of even everyday common garden variety of intelligence just instinctively knows that he is taking some risk when he elects to jump from one level to another.
In Casselmann v. Tug CAPTAIN KELLY, 215 F.Supp. 240 (D.C.La., 1963), a seaman was injured while attempting to jump from a barge onto the deck of a ship. At the time the jump was attempted, the vessel was swinging away from the barge and the distance between the two ships was increasing. The Court stated:
“Casselmann did not wait for Captain Lafleur to swing the Tug CAPTAIN KELLY back against the Barge SINCLAIR 17, which would have allowed him to step from the Barge SINCLAIR 17 to the upper deck of the Tug CAPTAIN KELLY. Instead, Casselmann took it upon himself to jump out four to six feet over open water and down five or six feet to the deck of the Tug CAPTAIN KELLY, which was still swinging away from the Barge SINCLAIR 17. He landed on his left leg, causing the injury complained of herein.

“The Tug CAPTAIN KELLY was not unseaworthy because a ladder was not on board. The absence of the ladder was unimportant because had Cassel-mann waited for the vessel to be swung back into position, he could have stepped across from the Barge SINCLAIR 17 to the upper deck of the Tug CAPTAIN KELLY and he would not have been injured. . . . Thus, the absence of the ladder played no part in his injury.

“The sole proximate cause of Cassel-manris injury was his own gross negligence in jumping from the deck of the Barge SINCLAIR 17 to the deck of the Tug CAPTAIN KELLY.” 215 F.Supp. at 242-243.
In Debose v. Loppersum, 438 F.2d 642 (5th Cir. 1971), a Sieracki seaman sued the shipowner charging Jones Act negligence and unseaworthiness. Judgment was rendered for the shipowner, which on appeal by the seaman was affirmed. The 5th Circuit Court of Appeals, in so affirming, said:
“While the plaintiff and others were loading bundles of lumber aboard the ship, difficulty was experienced in the *464 placement of one of the last bundles. The plaintiff elected to go beneath the deck to guide the bundle into place and he contends that while he was 'guiding’ the lumber he injured his back. The district court found from the evidence that the equipment involved was reasonably fit for use in stowage of the cargo in question and that the method of stowage was reasonably safe. The court further found that the plaintiff’s election to go beneath deck was his own decision and was not ordered or recommended by the vessel owners or the stevedoring company for which he worked. Giving full consideration to all of the facts, it was decided that the plaintiff had failed to prove by a preponderance of the evidence that the defendants did not furnish the plaintiff a seaworthy vessel nor did the plaintiff show that his injury was caused by any negligence attributable to the defendants or by an unseaworthy condition. The court concluded, therefore, that the injury to the plaintiff was ‘the result of his own actions and not of any unseaworthy condition, insufficient personnel or equipment, or improper or reasonably unsafe method or negligence on the part of anyone except himself.’ ” 438 F.2d at 642-643.
Inasmuch as the appellee was not “forced” to jump, nor “ordered” to jump, and inasmuch as any potential danger was perfectly apparent and obvious to any person of ordinary and average intelligence, and inasmuch as appellee acted freely and voluntarily, no negligence of any kind was proved against the shipowner nor was there any evidence of any kind that the vessels involved were unseaworthy in any way. Therefore, the appellee simply did not make out a case, and the court should have directed a verdict for the appellant.
The judgment for the appellee is, therefore, reversed and judgment rendered here for the appellant.
Reversed and judgment here for appellant.
GILLESPIE, C. J., and INZER, SUGG and BROOM, JJ., concur.